BHOLA, Admr., Appellant,

v.

The STATE of Ohio et al., Appellees.

[Cite as *Bhola v. State* (2001), 143 Ohio App.3d 644.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 00AP–862.

Decided May 31, 2001.

*Gordon S. Friedman* and *Bradley L. Greene,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Eric A. Walker,* Assistant Attorney General, for appellees.

PETREE, Judge.

On December 17, 1998, plaintiff, Kenny Bhola, administrator of the estate of Bhomeshwar Deokarran, Bhola's brother, filed a negligence action in the Ohio Court of Claims against defendant, Northcoast Behavioral Health Care System [1] ("NBHCS"), a state psychiatric hospital. The action arose out of the beating death of Deokarran by Damien Corley while both were patients at NBHCS.

The case was bifurcated and proceeded on the issue of liability on June 26 and 27, 2000. Following the close of the evidence, NBHCS moved that Bhola's case be dismissed pursuant to Civ.R. 41(B)(2). By entry filed June 30, 2000, the court granted NBHCS's Civ.R. 41(B)(2) motion and dismissed the case with prejudice. Bhola has timely appealed the court's judgment, advancing two assignments of error, as follows:

"[1]. The court's order dismissing plaintiff's case pursuant to 41(B)(2) of the Ohio Rules of Civil Procedure was against the manifest weight of the evidence and should be vacated.

"[2]. The trial court committed prejudicial error in denying the admissibility of the plaintiff's relevant evidence."

---

1. Plaintiff's complaint also named the Ohio State Highway Patrol as a defendant; however, plaintiff dismissed the Ohio State Highway Patrol as a party at trial.

The evidence presented at trial consisted of the following. On December 26, 1997, Deokarran, a twenty-five-year-old male, was admitted to NBHCS for a bipolar disorder. In the days prior to his admission, Deokarran acted strangely and physically attacked a family member. His family made arrangements for his hospitalization.

In late December 1997, Corley, a twenty-year-old male, attended a party at which he ingested Phencyclidine ("PCP") and marijuana. When he began acting strangely at home, Corley's father, Matthew Dumas, arranged for Corley to be taken to a nearby hospital. Corley was treated and released into his family's care the same day. On the drive home, Corley, a passenger in the car, claimed that people in passing vehicles were trying to kill him; he then grabbed the steering wheel and pressed the accelerator. Dumas restrained Corley and thereafter took him to a different hospital for a psychiatric evaluation. That evaluation resulted in a recommendation that Corley be admitted to NBHCS.

Fearing that Corley might harm someone, Dumas called his friend, James Robinson, a therapeutic program worker at NBHCS, and informed him that Corley was skilled at martial arts. Dumas asked Robinson to pass the information along to staff and security. As he was busy with other duties, Robinson did not convey the information to any other staff members. Dumas testified that he also informed NBHCS's attending physician, Dr. Hong Kim, of Corley's martial arts expertise.

Nurse Patricia Singleton performed the initial admission assessment of Corley at 11:45 a.m. on December 28, 1997. Singleton noted in the assessment that Corley had tested positive for PCP and marijuana and appeared confused, disorganized, suspicious, and afraid; however, he was cooperative and exhibited no signs of aggressive behavior. Based on this information, Singleton did not consider Corley to be a danger to himself or others. Singleton testified that at the time she assessed Corley, she was unaware of his martial arts skills; however, had that information been provided, she would have charted it and relayed the information to staff and physicians for security purposes.

Dr. Kim assessed both Deokarran and Corley upon their admissions to NBHCS. Dr. Kim placed Deokarran on assault precautions because he felt at the time that he might pose a danger to others. According to Dr. Kim, Corley was delusional and confused at the time he was admitted. Dr. Kim denied that he had ever spoken to Dumas on the telephone; however, he admitted that he was aware that Corley had taken PCP and was a martial arts expert.

At approximately 3:00 p.m. on December 28, 1997, Corley attempted to run through a plexiglass window on the fifth floor of the hospital. Thereafter, Dr. Kim ordered that Corley be sedated and placed in the seclusion and restraint room for four hours. Corley was also placed on suicide precautions, which

required observation every fifteen minutes. Corley remained in isolation after the four-hour seclusion and restraint period expired because he was sleeping and the isolation room was not needed for other patients. Corley was removed from isolation at 11:00 p.m. when the room was needed for an acutely ill patient. At that time, Nurse Rita Staley assessed Corley's condition. According to Staley, Corley was groggy from the medication, but posed no harm to himself or others. Accordingly, she ordered that he be removed from isolation and placed in Deokarran's room. The suicide precaution order remained in effect.

Nurse Charles Seasor was one of the floor nurses on duty during the late hours of December 28, 1997 and the early morning hours of December 29, 1997. He testified that even though Deokarran was on assault precautions, and Corley had taken PCP, was a martial arts expert, and was on suicide precautions, he did not find it unusual that Corley had been placed in the room with Deokarran because Corley had not exhibited any assaultive behavior and had not voiced any threatening statements toward staff or other patients after he was removed from the seclusion and restraint room.

According to Seasor, Deokarran was taken to a nearby hospital at approximately 12:15 a.m. on December 29, 1997, to have his arm recast.[2] Deokarran returned to the room approximately two hours later. At around 5:00 a.m., Seasor began making rounds, which included checking patient rooms. Nurse Jones, the second floor nurse on duty, remained at the nurse's station while Seasor made his rounds.

Because Corley was on suicide precautions, Seasor checked Corley and Deokarran's room at 5:00 a.m., 5:15 a.m., 5:30 a.m. and 5:45 a.m. He neither heard nor noticed anything suspicious during his rounds, nor did Jones report to him that she noticed anything unusual. However, when Seasor entered the room at 6:00 a.m., he found Deokarran lying facedown on the floor between the beds. His neck, both legs, and his left arm were tied with hospital gowns to the bed frames, and his face was badly beaten. Corley appeared to be asleep on one of the beds. Seasor called for assistance; Dr. Kim and several other staff members responded. Deokarran was taken to the hospital where he subsequently died. Immediately after the incident, Corley told Dr. Kim that the voices in his head had told him to harm Deokarran. Corley was prosecuted for Deokarran's murder and was found not guilty by reason of insanity.

Corley testified that when Deokarran returned to the room after having his arm recast, he walked over to Corley's bed and punched him in the forehead. Because he was not injured by the blow, Corley told Deokarran to lie down and go to sleep. Corley then fell asleep. He was awakened sometime later when

---

2. Deokarran apparently injured his arm sometime prior to his admission to NBHCS.

Deokarran began to choke him. After Corley freed himself, the two began fighting. Corley testified that during the altercation, he heard voices in his head telling him "kill or be killed." According to Corley, he knocked Deokarran to the floor several times. Each time, however, Deokarran would get up and begin fighting again. Eventually, Corley knocked Deokarran to the floor, tied him facedown to the posts of the two beds, and beat him severely. He did not report the altercation to any staff member.

NBHCS called J. Richard Ciccone, M.D., forensic psychiatrist and professor of psychiatry at the University of Rochester School of Medicine, as an expert witness. Dr. Ciccone testified that in preparing his testimony, he reviewed various materials associated with the investigation of Deokarran's death, including the autopsy report, medical charts for both Corley and Deokarran, various investigative reports, the depositions of plaintiff, Robinson, Dr. Kim, Corley, Dumas, and Seasor, and NBHCS's seclusion and restraint policies. Dr. Ciccone opined that NBHCS's admission diagnoses of both Deokarran and Corley were reasonable. He further opined that NBHCS's decision to remove Corley from the seclusion and restraint room and place him in a room with Deokarran was reasonable under the circumstances and that it was not foreseeable that a fight would erupt between them. In support of his opinion, Dr. Ciccone cited staff reports that neither Deokarran nor Corley had attempted to assault either patients or staff members at NBHCS; that Corley was calm, directable, and manageable after being taken out of the isolation room; that Corley exhibited none of the traditional signs of pre-assaultive behavior, such as shouting, mumbling, threatening stares, or clenched fists; and that Corley was observed at fifteen-minute intervals, consistent with NBHCS's suicide precaution policy, following his release from isolation.

Because we find the second assignment of error dispositive of the instant case, we will address it first. By this assignment of error, Bhola contends that the trial court erred by refusing to permit the testimony of his expert witness, Dr. Thomas Joynes.

Dr. Joynes testified that he graduated from Howard University Medical School in 1959 and completed a five-year psychiatry residency in 1964. He further testified that over the next thirty-five years, he treated psychiatric patients in various correctional institutions, mental health centers, and psychiatric hospitals around Ohio. He retired in 1998, but maintains his Ohio license to practice psychiatry.

NBHCS objected to Dr. Joynes's testimony on the basis that he did not meet the competency requirements of Evid.R. 601(D) to testify as an expert on liability issues for a "medical claim." Specifically, NBHCS argued that because Dr. Joynes was retired, he did not satisfy the requirement of being engaged in an "active clinical practice" within the meaning of Evid.R. 601(D). Bhola argued

that Dr. Joynes was competent to testify as an expert under Evid.R. 702. The trial court agreed with NBHCS and did not allow Dr. Joynes to testify. Bhola was, however, permitted to proffer into the record a report prepared by Dr. Joynes.

Evid.R. 601(D) provides:

"Every person is competent to be a witness except:

"* * *

"(D) A person giving expert testimony on the issue of liability in an claim asserted in any civil action against a physician, podiatrist, or hospital arising out of the diagnosis, care, or treatment of any person by a physician or podiatrist, unless the person testifying is licensed to practice medicine and surgery, osteopathic medicine and surgery, or podiatric medicine and surgery by the state medical board or by the licensing authority of any state, and unless the person devotes at least one-half of his or her professional time to the active clinical practice in his or her field of licensure, or to its instruction in an accredited school."

Evid.R. 601(D) restates R.C. 2743.43(A), which precludes "expert testimony on the liability issues in a medical claim as defined in division (D)(3) of section 2305.11 of the Revised Code," unless the witness satisfies similar standards.[3] R.C. 2305.11(D)(3) defines a "medical claim" as "any claim asserted in any civil action against a physician, podiatrist, or hospital, arising out of the diagnosis, care, or treatment of any person." Evid.R. 601(D) and R.C. 2743.43(A) thus seek to preclude nonclinicians from testifying about the quality of clinical care. *Price v. Cleveland Clinic Found.* (1986), 33 Ohio App.3d 301, 304, 515 N.E.2d 931, 934–935. The phrase "arising out of the diagnosis, care, or treatment of any person" describes clinical assistance for a patient. *Id.* Therefore, neither Evid.R. 601(D) nor R.C. 2743.43(A) applies to the instant case, unless Bhola's claim arises out of "the diagnosis, care, or treatment of any person," *i.e.,* NBHCS's clinical care of Deokarran.

Bhola's complaint purports to state two separate causes of action against NBHCS: (1) breach of the "duty to provide [Deokarran] competent medical and psychiatric care, assessment and treatment"; and (2) breach of the "duty to

---

**3.** R.C. 2743.43(A) provides:

"No person shall be deemed competent to give expert testimony on the liability issues in a medical claim, as defined in division (D)(3) of section 2305.11 of the Revised Code, unless:

"(1) Such person is licensed to practice medicine and surgery, osteopathic medicine and surgery, or podiatric medicine and surgery by the state medical board by the licensing authority of any state;

"(2) Such person devotes three-fourths of his professional time to the active clinical practice of medicine or surgery, osteopathic medicine and surgery, or podiatric medicine and surgery, or to its instruction in an accredited university."

provide proper security, to protect [Deokarran] from harm, and to supervise [Deokarran] and other patients." Citing only the first stated cause of action, NBHCS frames Bhola's lawsuit in terms of a medical malpractice claim. Upon review of the record, however, it is clear that Bhola's theory of the case was that Deokarran's death resulted not from improper medical diagnosis, care, or treatment, but from NBHCS's negligent failure to protect Deokarran from physical assault by Corley. Indeed, in his opening statement, Bhola's counsel argued that NBHCS "created a dangerous condition" by placing Corley and Deokarran in the same room and breached its duty to keep Deokarran safe. Bhola's characterization of his claim against NBHCS as a negligent custodial decision rather than a medical malpractice claim is further bolstered by the testimony of NBHCS's own staff members. Dr. Kim testified that the assignment of patients to rooms was not part of his responsibility as attending physician. Further, Rita Staley, the nurse who assessed Corley after he was removed from isolation, testified that she gave the order to place Corley in the room with Deokarran without checking with Dr. Kim. From this testimony, it is apparent that patient room assignment procedures at NBHCS involved administrative/custodial decisions that could be accomplished by nonphysicians, rather than "diagnosis, care, or treatment" decisions that could only be accomplished by physicians. Consequently, Evid.R. 601(D) and R.C. 2743.43 do not apply to this case.

Pursuant to R.C. 5122.29, a hospital has a duty to protect the rights of its mentally ill patients. That section reads:

"All patients hospitalized or committed pursuant to this chapter have the following rights:

"* * *

"(B) The right at all times to be treated with consideration and respect for his privacy and dignity, including without limitation, the following:

"* * *

"(2) A person who is committed, voluntarily or involuntarily, shall be given reasonable protection from assault or battery by any other person."

Thus, it is clear from the plain language of R.C. 5122.29 that NBHCS had a duty to reasonably protect Deokarran from harm inflicted by another patient during his stay at the facility. *Fair v. St. Elizabeth Med. Ctr.* (2000), 136 Ohio App.3d 522, 527, 737 N.E.2d 106, 109–110.

Evid.R. 702 provides:

"A witness may testify as an expert if all of the following apply:

"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

Given that Dr. Joynes treated psychiatric patients in mental health facilities and psychiatric hospitals over the course of his long career as a psychiatrist, he most certainly was familiar with the operation of psychiatric hospitals in general and, more specifically, with the standard of care owed by psychiatric hospitals to protect patients from harm inflicted by other patients. Thus, Dr. Joynes clearly satisfied general standards for an expert witness called to testify regarding NBHCS's duty to provide protection and security for Deokarran, including the reasonableness of NBHCS's decision to place Deokarran in the same room with Corley. Indeed, in his proffered report, Dr. Joynes criticized NBHCS's failure to include "the protection of potential victims" in its treatment plans for Corley, finding such failure particularly egregious given NBHCS's knowledge of Corley's PCP-induced paranoia and his expertise in martial arts. In addition, Dr. Joynes opined that Corley should have been assigned twenty-four-hour nursing personnel and isolated from other patients until his body was cleared of PCP and his paranoia receded.

In short, it is this court's view that Dr. Joynes was competent to testify as to the standard of care set forth in R.C. 5122.29(B)(2) and the reasonableness of NBHCS's decision to house Corley and Deokarran in the same room. We believe that his testimony could be helpful to the trier of fact. Thus, we conclude that the trial court abused it discretion in excluding Dr. Joynes's testimony pursuant to Evid.R. 601(D).

Accordingly, the second assignment of error is well taken and the matter must be returned to the trial court for a new trial. Bhola's first assignment of error is thus rendered moot by the resolution of the second assignment of error. App.R. 12(A)(1)(c).

For the foregoing reasons, Bhola's second assignment of error is sustained, and his first assignment of error is moot. Accordingly, the judgment of the Ohio Court of Claims is reversed, and this cause is remanded to that court for further proceedings in accordance with law and consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

BOWMAN and KENNEDY, JJ., concur.